## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jul 27 2015, 10:07 am
CLERK
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Anthony M. Rose
South Bend, IN

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of B.G. & F.G. (Children), | July 27, 2015 |
| and, | Court of Appeals Cause No. 71A05-1411-JT-541 |
| F.G., Sr., | Appeal from the St. Joseph Probate Court |
| *Appellant-Respondent,* | Cause No. 71J01-1403-JT-31 |
| *v.* | 71J01-1403-JT-32 |
| The Indiana Department of Child Services, | The Honorable James Fox, Judge |
| *Appellee-Plaintiff.* | |

**Barnes, Judge.**

## Case Summary

F.G., Sr. ("Father") appeals the termination of his parental rights to his children, F.G. and B.G. We affirm.

## Issue

Father raises one issue, which we restate as whether the evidence is sufficient to sustain the termination of his parental rights.

## Facts

A.V. ("Mother") and Father had two children together, F.G., who was born in January 2005, and B.G., who was born in February 2008. On April 4, 2012, the Department of Child Services ("DCS") removed the children from Mother's care due to allegations of neglect, lack of supervision, and illegal drug use by Mother. Father was incarcerated beginning in April 2012 for an habitual traffic violator offense, and DCS could not locate him. Father has had numerous driving offense convictions, including at least one driving while intoxicated conviction.

DCS filed a petition alleging that the children were children in need of services ("CHINS"), and Mother admitted to the allegations. The children were

initially placed with their maternal grandmother. However, in September 2012, the children were moved into a foster home.

[5] Father was eventually located, and in September 2013, Father also admitted the allegations contained in the CHINS petition. The trial court ordered Father to "participate in any classes he can while incarcerated at the Westville Correctional facility." Ex. A p. 25. Father had no contact with the children during his incarceration. In fact, Father had not seen the children for approximately one year before his incarceration.

[6] Mother's parental rights were eventually terminated. In March 2014, DCS also filed a petition to terminate Father's parental rights. A hearing was held in August 2014. DCS presented evidence that Father was not due to be released from incarceration until November 2016, that he did not begin taking any classes while incarcerated in the Department of Correction until after the petition to terminate his parental rights was filed, and that the children were doing well in foster care. In October 2014, the trial court entered findings of fact and conclusions thereon terminating Father's parental rights. Father now appeals.

## Analysis

[7] Father challenges the termination of his parental rights to F.G. and B.G. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care,

custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[8] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the

findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[9]   Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship."  Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)   that one (1) of the following is true:
>
>> (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)   that termination is in the best interests of the child; and
>
> (D)   that there is a satisfactory plan for the care and treatment of the child.

The State must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

### A. Changed Conditions

[10]   Father first argues that the trial court's conclusion that the conditions that resulted in the children's removal or the reasons for placement outside the

home of the parents will not be remedied is clearly erroneous.[1]  In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions.  *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.  However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child."  *Id.*  The trial court can properly consider the services that the State offered to the parent and the parent's response to those services.  *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*.

[11]     The trial court found:

> a. The Court credits Father's and paternal grandmother's testimony, and therefore finds that the [children were] unable to be placed with father due to his ongoing incarceration.  Father testified that he has recently sought enrollment in Indiana Department of Correction programs that will possibly reduce his sentence.  Father was unable to explain why he has previously failed to engage in these programs.

---

[1] Father also argues that the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the children is clearly erroneous.  Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive.  Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here.  Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the children.  The trial court found a reasonable probability that the conditions that resulted in the children's removal and continued placement outside Father's home would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion.  Thus, we need not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children.  See, e.g., Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 148 n.5 (Ind. 2005); In re T.F., 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), trans. denied.

b.  Sadly, the Court must find that Father, despite his testimony, has displayed a pattern of behavior that is focused on his wants rather than the interests of his children. Father testified that he knew that continued driving would likely lead to incarceration. Despite this he inexplicably continued to drive. Father knew that he could contact the Department of Child Services yet did not enroll in them [sic]. The Father knew that there were programs that would allow for a reduction of sentence yet did not [sic]. Father knew that he could contact his children, but failed to do so, yet contacts former girlfriend and her children instead.

c.  Indeed, while the Court credits [Father's] attempts to engage in programs that might reduce his sentence, it finds that this is entitled to almost no evidentiary weight: [Father's] testimony must be weighed against the pattern of prohibitive behavior that resulted in his ongoing incarceration and lack of involvement in his children's life during this pendency of this case.

d.  There is certainly a remote possibility that [Father] will, at long last, begin to make even small steps toward reducing his sentence. However, rather than speculate on how [Father] might respond in the future, "the court must evaluate the parent's pattern of conduct to determine the probability of future neglect or deprivation." [Father's] conduct has been almost uniformly negative during this case's pendency.

e.  Indeed, [Father's] argument proves too much: [Father] now laments that the Department of Child Services is remiss for not providing a program that would allow Father to extricate himself from the web of his own making. The Court finds this logic confused. It is a stretch to suggest that the Department of Child Services has any duty to provide a program in a situation that is and should be completely at the discretion of the Indiana Department of Correction. Indiana Department of Correction controls programming and the sentencing cuts that result from that programming. Parental rights are legitimately terminated even when a parent makes some but insufficient progress toward a remedy. [H]ere, Father only speculates that he will make progress. Importantly, the timeline on which the Court must focus in the child's, not [Father's].

f. In sum, the Court rejects [Father's] argument, and, as above, finds that the Department has clearly and convincingly proven that the conditions resulting in the [children's] removal will not be remedied.

App. pp. 13-14 (internal citations omitted).

[12] According to Father, he is scheduled to be released from incarceration in November 2016. Father argues that he is not a violent offender, that he has been a provider for his family, and that he has enrolled in programs that could reduce his sentence. Father also argues that he followed the dispositional order by enrolling in the programs at the prison.

[13] Father is currently scheduled to be released from incarceration in November 2016. Although the trial court ordered Father to enroll in courses through the DOC in September 2013, Father did not enroll in any courses until after the petition for termination of his parental rights was filed. If he completes the courses, he could have his sentence reduced, but no reduction was certain at the time of the hearing. His testimony at the termination hearing revealed that he did not have definite housing or employment plans for when he was released from his incarceration. Even if Father was released from incarceration early, he would still need to "do services, find housing, be able to provide for the children[, and] bond with the children." Tr. p. 62. Further, Father had not had contact with the children since a year before his incarceration, or approximately 2011.

[14] This case is distinguishable from *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), upon which Father relies. In *G.Y.*, our supreme court reversed the termination of a

mother's parental rights where, although she was incarcerated, her crimes were committed prior to the child's birth, she took several classes in prison to better herself, she had a positive and consistent relationship with the child, she had made employment and housing plans for after her release, and her release from prison was imminent. Here, Father does not have a relationship with the children, his crimes were committed after the children were born, his employment and housing plans were unclear, and he did not begin any classes until the termination petition was filed. Given Father's incarceration, uncertain future, and lack of relationship with the children, we cannot say that the trial court's conclusion that the conditions resulting in the children's removal or the reasons for placement outside Father's home will not be remedied is clearly erroneous.

### B. Best Interests

Next, Father challenges the trial court's conclusion that termination is in the children's best interests. In determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. *Id.*

The trial court found that the case manager, foster mother, and CASA indicate that the children are doing well and do not ask about Mother or Father. The trial court also noted that the CASA recommended termination. The evidence supports the trial court's findings. The children should not have to wait indefinitely for Father to be released from prison, complete the necessary

services, establish employment and housing, and develop a relationship with the children. During his testimony, even Father admitted that it was not fair to ask the children to wait on him. The children are doing well in their foster home, they have progressed in therapy, and F.G. especially would be "devastat[ed]" to be removed from the foster home. Tr. p. 42. Given this evidence, the trial court's finding regarding the children's best interests is not clearly erroneous.

## C. Appropriate Plan

[17]    Finally, Father argues that the trial court's conclusion that there is a satisfactory plan for the care and treatment of the children is clearly erroneous. In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child. *D.D.*, 804 N.E.2d at 268. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.*

[18]    The trial court found that the plan was for the children to be adopted by their foster parents and that the plan was "more than satisfactory." App. p. 14. The trial court credited the case manager's testimony "that the children are 'doing well' in their current foster placement, where they have been since removal. Notably, the children 'get along' with the home's other children." *Id.*

[19]    Father disagrees and argues that DCS's plan for the children is not satisfactory because of an allegation of sexual activity involving the children and another

child in the foster home. Evidence was presented that the incident was reported to a therapist, DCS was notified and investigated, the report was unsubstantiated, and a safety plan was put in place. The trial court addressed this concern and found that "allegations regarding the children in the foster home were promptly investigated and dealt with by the Department of Child Services. Service providers testified that they have counseled the children and are confident in the placement with the current foster parents." *Id.* at 15.

[20] DCS's general plan for the children was adoption, and that plan is satisfactory. The incident in question was appropriately addressed and does not affect whether DCS's plan is satisfactory. The trial court's conclusion is not clearly erroneous.

# Conclusion

[21] The trial court's termination of Father's parental rights to the children is not clearly erroneous. We affirm.

[22] Affirmed.

Riley, J., and Bailey, J., concur.