## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 22 2016, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

P.J.H. & J.H. *(Minor Children)*

and

P.H. *(Father)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 22, 2016

Court of Appeals Case No.
11A04-1606-JT-1224

Appeal from the Clay Circuit Court

The Honorable Joseph Trout, Judge

Trial Court Cause Nos.
11C01-1510-JT-208
11C01-1510-JT-209

**Robb, Judge.**

# Case Summary and Issue

[1] P.H. ("Father") appeals the juvenile court's termination of his parental rights to eight-year-old P.J.H. and seven-year-old J.H. ("Children"), raising a sole restated issue: whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] In 2013, Father, a veteran, and A.A. ("Mother") were dating and living together with the Children in a residence in Brazil, Indiana.[1] Also living in the home were Mother's three other children ("Half-Siblings") and their father, T.A.[2] In February 2013, the Indiana Department of Child Services ("DCS") received a report alleging two of the Half-Siblings were underweight, the family sometimes had no food in the home, a law enforcement K-9 unit recently searched the home, and Mother abused drugs. A week later, DCS confirmed law enforcement discovered a methamphetamine lab in the garage and marijuana in an upstairs bedroom; DCS then removed the Children from Mother's and Father's care. On March 4, DCS filed petitions alleging the

---

[1] Mother is not part of this appeal.

[2] Although not clear from the record, it appears Mother and T.A. were married, but Father and Mother were dating.

Children were children in need of services ("CHINS"),[3] and on June 25, 2013, the juvenile court entered an order adjudicating the Children as CHINS and ordering Father to participate in reunification services.

[3] On January 28, 2014, the juvenile court held a permanency hearing and DCS presented evidence that Father did not engage with the Children during visitation, failed two drug screens and skipped other screenings, missed parenting sessions, and failed to follow through with initial efforts to seek treatment through the Veterans Administration. The juvenile court then approved concurrent plans of reunification and termination of parental rights against Father.

[4] In the summer and early fall of 2014, DCS allowed the Children to return to Mother's and Father's care on a home trial visit. On November 3, 2014, the juvenile court granted DCS' motion to discharge the CHINS adjudication as to P.J.H., but not J.H.[4] However, on January 23, 2015, DCS filed another petition alleging P.J.H. as a CHINS, citing Mother's methamphetamine use. Both Mother and Father admitted to the material allegations set forth in the petition and the juvenile court adjudicated P.J.H. as a CHINS. Several months later, DCS requested leave to cease all reunification services, citing Mother's

[3] DCS also filed a petition alleging the Half-Siblings were CHINS, but Father is not the father of the Half-Siblings and neither Mother nor the Half-Siblings are subject to this appeal.

[4] The record indicates the reasons for the discharge as to P.J.H. were Mother's and Father's reasonable compliance with the dispositional decree. As to J.H., DCS noted his condition "declin[ed] drastically" during the home trial visit. Transcript at 117.

and Father's inability to comply with the case plans. As to Father, DCS noted Father did not comply with his substance abuse treatment, failed to attend drug screenings, and participated in visitation sporadically. DCS also did not believe Father could care for the Children. The juvenile court granted DCS' request and ordered the Children's permanency plan be amended to adoption.

[5] Around the same time, DCS filed a petition to terminate Father's and Mother's parental rights to the Children. At an evidentiary hearing, both the family case manager and the court-appointed special advocate ("CASA") opined Father's parental rights should be terminated. Following the evidentiary hearing, the juvenile court issued an order terminating Mother's and Father's parental rights, finding in relevant part,

> 19. According to the testimony and the exhibits proffered by [DCS], a . . . CHINS case was filed in October 2008. The Children, [P.J.H.] and [J.H.] were out of the home for 6 months as a result of that CHINS Action. At that time, [Father] and [Mother] resided together. In that case, [J.H.] was born with methamphetamine in his system and [Mother] tested positive for methamphetamine at the time of the birth. The safety of the children living in a home with a parent who uses methamphetamine and has a history of drug addiction was the basis for removal. Also of record in that file is [Father] refused to be drug screened.
> 20. [The present CHINS] action was brought against both parents in March 2013 . . . . In a fact finding hearing as to [Mother], it was found and concluded that "there is clear evidence that a methamphetamine lab was in operation in the garage on the parents' property which garage is within 15 ft.-30 ft. of the [C]hildren's residence, the presence of the lab with its chemical component is dangerous to the [C]hildren, [Mother]

has a history of prior cases with the department with the presenting issue in both cases being [M]other's use of methamphetamine, [M]other admitted to using methamphetamine during the investigation of this case and has tested positive for methamphetamine since the investigation of this case.["] It should be noted that a similar findings of fact and conclusion of law was found as to fathers, T.A. and [Father].
* * *
22. As to [J.H.] and the 2013 case . . . [Father] has not been fully compliant with the child's case plan in that he has only sporadically participated in visits, drugs screens, and services. Further, neither [F]ather nor [M]other have enhanced their ability to fulfill their parental obligations . . . .
23. In light of the fact that the 2013 [P.J.H.] CHINS case had been dismissed as to that child, it was refiled in January 2015. The report indicated that in 2014, DCS made an unannounced visit to the home. [Mother] and [Father] had completed drug screens and signed a safety plan that stated . . . [Father] would not allow the [C]hildren to be alone with [Mother] if he thought or knew she was under the influence of drugs. Thereafter, in January 2015, [Mother] began testing positive for methamphetamine. All parties admitted and disposition was on April 22, 2015. Once again, [Mother] and [Father], by disposition decree, was [sic] not to allow the use of or consume, manufacture, trade, or distribute any illegal controlled substances and not permit the possession or consumption of any illegal controlled substances in the home or in the presence of the [C]hildren.
* * *
25. According to the testimony, [P.J.H.] does not trust his parents to parent and does not feel safe. He has not had visits from his mom for a year. Father was incarcerated twice in 2015 and visited one time after he was most recently released from jail. It was the opinion of the supervisors of parenting time that [Father] has an inability to watch both [C]hildren. Visits were voluntarily stopped by Father due to the emotional impact it was having on the [C]hildren, in fact [J.H.] wet the bed every night

after visiting with his father.

26. It has been the testimony from multiple witnesses that, through no fault of his own, [Father] has cognitive disabilities that prevent him from effectively parenting young children including one that is autistic. Father himself is under a legal guardianship and, according to the witnesses, lacks parenting skills and would not be able to take care of these [C]hildren.

* * *

36. The [C]hildren would be severely traumatized if required to visit with their biological parents.

37. Parents have had multiple prior contacts with DCS and the [C]hildren have been removed from their parents by DCS on at least three (3) prior occasions.

38. Father is cognitively unable to parent these [C]hildren, due to his own mental health needs.

39. Father has not complied with the terms of the dispositional decree, and was incarcerated a substantial part of the time of the pendency of the CHINS matters.

40. Father has been convicted and put on probation twice for possessing controlled substances. [Father] violated the terms of that probation by possessing/abusing controlled substances.

41. The [C]hildren are traumatized and act out behaviorally whenever they visit their father.

42. Father does not engage with [C]hildren during visits and will sometimes leave during the visits. Father loves the [C]hildren but due to his disability and theirs (especially [J.H.]), he cannot provide the necessary education or supervision.

* * *

45. The [C]hildren are well settled in their current foster family. The [C]hildren have a bond with their foster family and their foster family with them.

46. It would severely traumatize the [C]hildren to remove them from that home. The [C]hildren have a right to permanency and it is in their best interest to be adopted by the foster family. The foster family is willing to adopt the [C]hildren.

Appellant's Appendix at 18-21. Father now appeals. Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

"[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed . . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014) (alteration in original) (citation omitted). Indiana Code section 31-35-2-4(b)(2) sets out what must be proven in order to terminate parental rights, which we quote in relevant part:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>        \* \* \*
> (C) that termination is in the best interests of the child . . . .

The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines that the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## II. Children's Best Interests

Father contends the juvenile court's termination order is clearly erroneous, arguing DCS failed to present clear and convincing evidence to establish termination of his parental rights is in the best interests of the Children. [5]

> In determining what is in the best interests of the Children, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and to look to the totality of the evidence. In so doing, the court must subordinate the interests of the parent to those of the children. The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

---

[5] Specifically, it appears Father argues the trial court erred in considering his mental health issues when it found Father is cognitively unable to parent the Children due to his mental health needs. We acknowledge Father suffers cognitively and note "[m]ental [disability] of the parents, standing alone, is not a proper ground for terminating parental rights." *In re V.A.*, 51 N.E.3d 1140, 1147 (Ind. 2016) (alteration in original) (citations and internal quotation marks omitted). However, in cases where parents are "incapable of or unwilling to fulfill their legal obligations in caring for their children," mental disability may be considered. *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992). We further note, the focus in determining what is in the best interests of the Children is the Children, not the parents, and although we commend and thank Father for his service to this country and hope he can receive the treatment he seeks, the evidence in this case—including his arrests, lack of participation in services, dependency on others for care and support, and substance abuse issues—overwhelmingly establishes Father has not provided the Children with the necessary care and support and is incapable of doing so. Thus, the trial court did not err in considering Father's mental health issues in terminating his parental rights.

*A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013) (citations omitted), *trans. denied*.

[8] Here, Father does not challenge the juvenile court's conclusion that there is a reasonable probability the conditions resulting in the Children's removal will not be remedied, and both the CASA and the family case manager opined it would be in the Children's best interests for Father's parental rights to be terminated. Accordingly, these findings are sufficient to show by clear and convincing evidence that termination is in the Children's best interests. *See id*.

[9] Further, we note "[p]ermanency is a central consideration in determining the best interests of a child." *Id*. at 1159 (alteration in original) (citation omitted). The findings establish the Children, both of whom have special needs, have been removed from Father's care on multiple occasions. Moreover, DCS expressed concern because after one of the trial home visits, the Children "each lost at least one or two clothing sizes . . . they had lost so much weight they were emaciated and quite undernourished." Tr. at 116. Since the Children have been in their foster home, "They have done well. They attend school regularly . . . . And they're progressing. They're maturing. They look healthy. They've gained weight. They look well." *Id*. at 44.

[10] We therefore conclude DCS established by clear and convincing evidence that termination of Father's parental rights is in the best interests of the Children.

# Conclusion

DCS established by clear and convincing evidence the elements necessary to support the termination of Father's parental rights. The judgment of the juvenile court terminating Father's parental rights is affirmed.

Affirmed.

Kirsch, J., and Barnes, J., concur.